Tokley, J.
delivered the opinion of the court.
In December, 1837, the legislature of the State passed an Act to incorporate a Company to be called the Lebanon and *244 Sparta Turnpike Company, to make a Turnpike Road from Sparta to Lebanon.
By the 2nd section of the act, commissioners were appointed to open books, for the purpose of receiving subscriptions to the amount of one hundred and fifty thousand dollars, to be applied to the purpose of making the road, to be divided into shares of fifty dollars each, and it provides that as soon as twenty-five thousand dollars shall be subscribed, a meeting of the stockholders shall be held; after which the subscribers shall be cpnstituted a body politic and corpoi-ate by the name of the Lebanon and Sparta Turnpike Company, with power to own, sell and buy property; sue and be sued in their corporate name and character, and have, enjoy and possess all the rights, privileges and powers appertaining to bodies politic and corporate by law, and shall have succession for ninety-nine years; that the subscribers, or a majority of them, being present at their first meeting shall elect seven Directors who shall be stockholders, who shall elect one of their number President of the board of directors, and the President and Directors thus chosen may from time to time require such advances on the shares subscribed, as the wants of the Company may require. — And for the purpose of enforcing the payment of these calls, it is provided by the 3d section of the act that “if any subscriber shall fail to pay any calls that are made in pursuance of the provisions of the 2d section of the act, his stock shall be sold for the amount of said call and the purchaser shall have all the rights and be subject to all the liabilities of the original owner,” and “if the stock does not bring the amount, the owner shall be liable to be sued for the balance before any jurisdiction having cognizance thereof, and if it brings more than the call and cost, the overplus shall be paid over to the original owner.”
Under the provisions of this statute, books were opened by the commissioners for the subscription of stock, the requisite amount was taken; a meeting of the subscribers was held, and a President and Directors appointed, who proceeded to the discharge of the duties imposed on them.
Among the subscribers was the defendant, who took twenty shares, which at fifty dollars a share, amounts to one *245 thousand dollars. The President and Directory in pursuance of the powers vested in them, made contracts for making the road, and for the purpose of paying such contracts, they from time to time made calls, according to the provisions of the statute, upon the stockholders, none of which were met by the defendant. No advantage was taken of this his default; no steps taken against him therefor, but the company under the direction of the President and Directors, proceeded to make the road which has been completed, without the aid of any advancement from the defendant upon the stock by him subscribed. After the road was completed, the Company filed a bill in the Chancery Court at Carthage, asking an account against the defendant for the amount of his stock. This suit was so prosecuted that at the February term, 1843, of said court, it was ordered, adjudged and decreed, that the clerk and master of the court should sell defendant’s twenty shares of stock, so subscribed as aforesaid, at public auction for cash, twenty days previous notice thereof being given, and report to the next term. At the next term the clerk and master reported, that he had, in pursuance of the ' decree, sold said stock to Jacob Fite for five dollars, which report of sale was confirmed by the Chancellor, and ' a final decree given against the defendant for nine hundred and ninety-five dollars, the balance of the subscription for the twenty shares of stock subscribed by him.
At the February term, 1844, the defendant filed a bill to review this decree, which' was dismissed by the Chancellor, and thereupon an appeal is prosecuted to this court.
The question- now presented for our consideration, is, whether there be error apparent upon the face of the original decree against the defendant? and we are of opinion that there is.
The whole difficulty in the solution^of this question, arises out of the construction of the 3d section of the act incorporating the Company. We have seen that by the provisions of the 3d section of the act, the President and Directors are authorized to make calls from time to time of five dollars on each share subscribed; that this was done until the full *246 amount of the stock was exhausted; and that to every calí defendant failed to respond.
Now the question is, what remedy has the company against him for this default? It is either at common law or under the statute, for no one will deny that an incorporated company has the power to compel a performance of the obligation undertaken by its stockholders. If there is no provision made in the statute of incorporation for enforcing this obligation, the common law gives an ample remedy by action of assumpsit, which action has been used again and again by corporations for this purpose; but if a remedy be given by the statute, it may be pursued, but it must be pursued in strict conformity with the statute, and will be held auxiliary to the remedy by action of assumpsit unless there be something in the proceeding which by necessary construction excludes that remedy.
The 3d section of the statute which has been quoted, gives a remedy for enforcing a speedy payment of the calls as made, and it becomes necessary for us to enquire — 1st; •whether this remedy supersedes that by action of assumpsit? 2d; whether it has not been lost by the failure of the Company to use it in proper time? and 3d; whether a court of chancery can now enforce it?
■ 1st. The action of assumpsit being an appropriate remedy for a chartered company to recover its subscriptions from its stockholders, secured by law, it cannot be lost but by express prohibition to use it, or by the adoption of some other remedy inconsistent with its use. Does the 3d section of the act, incorporating this company, contain such prohibition or adoption? It certainly contains no such prohibition. Does it contain such an adoption? We think not. If the company had been left alone to its remedy by action, great delay would have been necessarily consequent thereon, and great hinderance in the execution of the purposes for which it was incorporated, to the detriment, both of the company and the public; and to remedy this inconvenience, the framer of the statute chose to give a more expeditious mode of proceeding, to wit, by a sale of the stock, upon a default of the payment of any call made by the President and Directors for the pur *247 pose of meeting the call. But if the company think proper not to use this more expeditious remedy, because they may believe that the more dilatory one will answer the end, is there any principle of law to prohibit it from so doing? None that we can see.
We are therefore compelled to hold that, the remedy by action of assumpsit exists, notwithstanding the remedy provided by the statute.
2d. Has not the remedy provided by the statute been lost by a failure on the part of the company to use it in proper time? We think it has. The argument of this proposition involves the construction of the 3d section of the act of incorporation. It provides, as we have seen, that “if any subscriber shall fail to pay any calls, his stock shall be sold for the amount of said call, and the purchaser shall have all the rights and be subject to all the liabilities of the original owner.” Now it is obvious that this paragraph of the section was intended to enforce the payment of the calls as made, and that the intention was, that if the stockholctesHsaStíu&SB*!!!1^ defaulter, the company should have the poT^s^^T&ssew&isS; the connexion between them, and to substitute&another in his stead; and that it was not intended for anySlMÜ'O'Oli against him for a defalcation in the payment of the whole amount of his stock. “His stock shall be sold\foiltlfeB^<Aii&f5f♦ of said call,” (in the singular, not the plural)'^^ch that it was intended that this remedy should be usecrapon the first defalcation. “And the purchaser shall have' all the rights, and be subject to all the liabilities of the original owner.” This certainly can have reference alone to the liability of the original owner for the amount of calls to be made after that for which his stock was sold; for if there were no more calls to be made, there was no further liability on the part of the original owner. But this construction is rendered still plainpr by the last paragraph of the section:. “But if the stock does not bring the amount, the owner shall, be liable to be sued for the balance, before any jurisdiction having cognizance thereof; and if it brings more than the call and cost the surplus shall be paid over to the original owner.” If the stock shall not bring the amount; what *248 amount? The amount of the call and cost; shewing that this remedy was only intended to enforce the payment of the calls as made and nothing more.
This construction of the remedy gives ample protection to the corporation. If the calls are not paid, it may use it to dissolve the connexion between it and the corporation, and substitute another in his stead, who will take his responsibilities, with the hope of his being more faithful in the performance of his obligation. If the company think proper not so to use it, but to continue the relation between itself and the original corporation, it has only to sue for its call and enforce a payment by ordinary means. A contrary construction, without benefiting the corporation, would, as this case shews, work intolerable mischief to the individual cor-porator. If the company may wait as in this case, until all the calls are made, and then sell the stock for cash, and hold the corporator responsible for the amount above what it brings, it must often be productive of what we here find, a sale of a thousand dollars of stock for five dollars'. "What responsibility of the original stockholder has been placed upon him by such a purchase? None whatever. He has got all and paid nothing. If this construction of the statute be correct, as we think it is, it necessarily follows, that the corporation not having used the remedy at the proper time, has lost the right to use it, in as much as all the benefit intended by it has been lost, and great mischief must result from its use.
We therefore think that the remedy by a sale of the stock before judgment obtained, has been lost by the laches of the company.
3d. Is it in the power of a court of chancery to enforce this remedy after it has been thus lost by the laches of the company? We know of no principle of equity jurisprudence by which this can be done. A remedy lost by the default of the party entitled to use it, has never been restored in a court of chancery, unless it has been so lost by the fraud of the opposite party. Yet it is this that the court of chancery has undertaken to do in this case. Therefore, upon the whole view of the case, we hold that the remedy given by the 3d section of this act of incorporation, is ancillary to that which *249 exists at common law; that it has been lost by neglect to prosecute it in proper time; that a court of chancery has no jurisdiction of-the case; that there is,' therefore, manifest error in the face of the original decree for which it should hafe been reviewed and reversed; and that the Chancellor erred in dismissing the bill of review.
We therefore reverse his decrees and dismiss the original bill with cost.
Note. — Where a statute gives to a corporation the power to sell the shares of a delinquent stockholder, it is held that the remedy is cumulative and does not impair the common law remedy by action, and although the corporation has attempted unsuccessfully to sell the shares of a member, their remedy by action is held still to remain. 2 Bibb. 577; 9 Johnson 217; 3 Hawks, 520; 4 Randolph, (Va.) 578.